UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
BRENDAN DONOHUE,

                           Petitioner,

        -against-

JOHN P. LEMPKE,

                       Respondent.
-------------------------------------------------------------X

FEUERSTEIN, District Judge:

**ORDER**
09-CV-3890 (SJF)

**FILED**
IN CLERK'S OFFICE
U S DISTRICT COURT E D N Y

★   JUL 13 2012   ★

**LONG ISLAND OFFICE**

Incarcerated petitioner Brendan M. Donohue ("Donohue" or "petitioner") has filed the

instant petition seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254. For the reasons

that follow, Donohue's petition is DENIED.


I.     Background

     A.     The Offense of Conviction

In the early morning hours of October 7, 2003, an individual named Francis Bambara

("Bambara") was badly burned in a car fire in Lindenhurst, New York. At the time of the fire,

the car was parked near a bar named Brian's Place, where both petitioner and Bambara had been

the night before. T667-68. As a result of the fire, Bambara suffered severe injuries to his legs

and the back of his head, T86,[1] and more than two-thirds of his body was covered with second or

---

[1] References to the trial transcript will be indicated as "T__." References to the sentencing transcript will be
indicated as "S__"

1

third degree burns. T471-72. On October 14, 2003, Bambara died from complications related to his injuries. T1430-31.

Later that day, petitioner was arrested in connection with the fire and Bambara's death. T792-93. While being placed under arrest, petitioner stated to a police officer: "Yeah, I knew you guys were looking for me." T793. He was subsequently indicted on one (1) count of arson in the first degree, in violation of Penal Law § 150.20, and one (1) count of murder in the second degree, in violation of Penal Law § 125.25.

B.    The Trial

On January 12, 2005, a jury trial commenced in County Court, Suffolk County, before Judge Gary J. Weber. T1.

1.    Voir Dire

The prosecutor, Assistant District Attorney Peter Timmons, asked the following questions during voir dire, over objection of defense counsel, Henry O'Brien:

> MR. TIMMONS: How about if I was just robbed. I'm sure the police officers have responded, where you responded to situations where somebody who is just robbed, you've got to find the 911 operator. The person is in an excited state. They are telling you what happened. All right? Do you think that person might be more likely to be truthful, because it just happened to them? Because they are all excited about what just happened?
>
> MR. O'BRIEN: Again, a continuing objection.
>
> COURT: Okay. Same disposition.
>
> MR. TIMMONS: What do you think, sir?
>
> PROPECTIVE JUROR #14: From the police experience here?

MR. TIMMONS: Yes.

PROSPECTIVE JUROR #14: The more immediate the situation, you know, generally, the chances are better that you are going to get more accurate information, the sooner, that you make the inquiries.

T109-10.

## 2. The Trial

Ozgur Erden ("Erden"), an attendant at a BP gas station located at Wellwood Avenue and Montauk Highway in Lindenhurst, testified on behalf of the People. According to Erden's testimony, petitioner entered the station in the early morning hours of October 7, 2003, paid Erden one (1) dollar, and pumped eighty-nine (89) cents' worth of gas into a metal container that resembled a vase. T381-83. Petitioner then walked in the direction of Brian's Place. T383.

Shortly thereafter, Erden heard a "poof" sound, as if a flame had ignited. T384-85. Erden stepped outside, where he saw a car in flames and a man without pants on. T387-88. The man was yelling and appeared to be in pain. T391. Erden also saw petitioner walking toward the gas station from the direction of the fire, with what appeared to be blood near his eyebrow. T394-96. Erden testified that he had not observed blood near petitioner's eyebrow when petitioner had entered the gas station earlier. Id.

The People introduced a surveillance videotape showing petitioner pumping gasoline into a container, T405-409, an empty container found nearby containing gasoline residue, T912-16, and an unburned book of matches found outside the vehicle. T906.

Several Suffolk County police officers, firefighters, and medical personnel also testified at trial. Suffolk County Police Officer Jiian Chapoteau ("Officer Chapoteau" or "Chapoteau")

3

testified that he was dispatched to the car fire and informed that an individual was inside the car. T80. Officer Chapoteau arrived at the scene and saw a car engulfed in flames. T82. After "quickly sp[eaking] to the gas station attendant," T83, Officer Chapoteau heard people screaming, "We found one." T84.

Officer Chapoteau walked over to the car and discovered Bambara standing there, badly burned. T85-86. Believing that Bambara "wanted to talk," Chapoteau asked him what his name was and what had happened. T88-89. Bambara responded: "Brendan burned me." T141. He also stated: "I can't believe he would do something like this. Brendan burned me and now he is going to jail." T96. According to Chapoteau's testimony, "[Bambara] was very concerned about getting out the story of what happened to him." T199.

Paul Mazza ("Mazza"), a member of the Lindenhurst Fire Department, testified that he arrived at the scene of the fire and saw Bambara, who mumbled: "Why did this happen? It was only an argument. I don't understand." T256. Bambara asked Mazza "for something to be done for the pain." Id. Dennis Heinlein, another member of the Lindenhurst Fire Department, testified that he asked Bambara what happened, to which he responded: "I was sleeping in the van – in the vehicle. And a guy that I drank with, that I know F'ing did this to me and I don't understand why." T230.

Emergency Medical Technician Jean Szabo ("Szabo"), who treated Bambara's injuries shortly after he was discovered, also asked what happened. Bambara responded that he had been sleeping, and that he woke up feeling something wet on him. T295. Szabo testified that Bambara "[said] it was a friend [who lit the fire]" and that "there was an argument." T295-98.

Doctor Scott Johnson treated Bambara at Stony Brook University Hospital. Doctor

4

Johnson testified that he asked Bambara what happened in order to obtain "a focused history" which would enable him "to adequately treat the patient. T467-69. Bambara told him "that someone threw gasoline on him while he was sleeping in a van, and lit him on fire." T469.

At trial, all of Bambara's statements implicating petitioner in the fire were admitted over the defense's objection. T224-25, T260, T294, T468.

Detective Michael Ruddick, an arson investigator for the Suffolk County Police Department, testified that petitioner's injuries, including singed eyelashes, were consistent with injuries he would have received by standing near the fire when it ignited. T1008. He testified that a match could have been used to light the fire, T909, and opined that gasoline was used as an accelerant. T946. In Detective Ruddick's opinion, the fire started in the rear seat area of the car's passenger compartment. T945. Detective Ruddick also testified that Bambara's injuries were consistent with him lying on the back seat of the vehicle, facing the rear of the car. T1122. Detective Ruddick ruled out all accidental causes of the fire. T946-47.

Detective Sergeant Edward Fitzgerald, another arson investigator who examined the scene, testified as an expert and expressed opinions consistent with those of Detective Ruddick. T1264, T1272. His investigation "eliminated all accidental causes, including those that may have been the result of the victim's actions." T1293.

The defense contended that Bambara had started the fire himself. It introduced evidence of Bambara's blood alcohol content, which was .12 at the time it was taken at the hospital, T1619, as well as psychiatric records indicating that he had previously contemplated suicide and "exhibited a major depressive disorder." T1570.

The defense's arson expert opined that the fire could have been started by a smoldering cigarette. T1841. He further testified that, given the victim's size and confined space in the back seat of the car, he could not "see any way, as a layman, that [Bambara] could remain sleeping in that position." T1849.

The People called two (2) witnesses to rebut the defense's characterization of Bambara's mental state. Doctor Murty Ayyala, a psychiatrist at a Veterans Administration Hospital, had treated Bambara, T1934, and Doctor Angela Hegarty testified as an expert in forensic psychiatry, T1991. Both testified that they believed that Bambara had been suffering from alcohol dependence and an alcohol-induced mood disorder, but not from any other psychiatric problem. T1936, T1947, T2000-10. Dr. Hegarty opined that .12 blood alcohol content was not unusually high for a chronic alcoholic, and that Bambara was unlikely to have committed suicide by self-immolation. T2015, 2022.

### 3. Jury Deliberation

During deliberation, the jury requested a readback of Detective Ruddick's testimony. The court told the jury that "the amount of time it would take to read back all of his testimony would be anywhere from ten to twelve hours . . . So if you really, really want to, we will do it. But, it will be a long siege." T2438. Thereafter, the jury did not request Ruddick's testimony. T2438-2454.

### 4. Verdict and Sentence

Petitioner was convicted of both charges in the indictment. T2454-55. On March 7, 2005 he was sentenced to two (2) concurrent periods of incarceration of twenty-five (25) years to life. S21.

### C. The Appeal

Petitioner appealed to the Appellate Division, Second Department. In his appeal, petitioner raised the following arguments: (1) that he was denied his Sixth Amendment right to confrontation when the trial court admitted Bambara's statements, through the testimony of other witnesses; (2) that experts called as prosecution witnesses gave improper opinion testimony, and that he was denied his right to effective assistance of counsel when trial counsel failed to preserve this issue for appellate review; (3) that the evidence against him was insufficient and the verdict was against the weight of the evidence; (4) that comments made by the prosecutor during voir dire denied him the right to an impartial jury and a fair trial; and (5) that the sentence imposed was unduly harsh and excessive. On April 8, 2008, the Appellate Division affirmed the conviction and sentence in all respects. People v. Donahue, 50 A.D.3d 820, 854 N.Y.S.2d 653 (2d Dep't 2008). The Court of Appeals denied leave to appeal on June 13, 2008. People v. Donahue, 10 N.Y.3d 933, 892 N.E.2d 406, 862 N.Y.S.2d 340 (2008).

On March 17, 2009, petitioner filed an application for a writ of error coram nobis. He alleged that his trial and appellate counsel were ineffective for failing to argue that: (1) the trial court did not properly respond to a note from the deliberating jury; and (2) the prosecution's summation deprived him of a fair trial. The Appellate Division denied his application on August

25, 2009. People v. Donahue, 65 A.D.3d 698, 883 N.Y.S.2d 914 (2d Dep't 2009). The Court of

Appeals denied leave to appeal on December 3, 2009. People v. Donahue, 13 N.Y.3d 906, 922

N.E.2d 909, 895 N.Y.S.2d 320 (2009).

Petitioner is currently incarcerated at Five Points Correctional Facility.


II.    Standard for Habeas Corpus Review

Pursuant to 28 U.S.C. § 2254(d), an application for a writ of habeas corpus:

[S]hall not be granted with respect to any claim that was adjudicated on the merits
in State court proceedings unless the adjudication of the claim – (1) resulted in a
decision that was contrary to, or involved an unreasonable application of, clearly
established Federal law, as determined by the Supreme Court of the United States;
or (2) resulted in a decision that was based on an unreasonable determination of
the facts in light of the evidence presented in the State court proceeding.

"An 'adjudication on the merits' is one that '(1) disposes of the claim on the merits, and

(2) reduces its disposition to judgment.'" Bell v. Miller, 500 F.3d 149, 155 (2d Cir. 2007) (citing

Sellan v. Kuhlman, 261 F.3d 303, 312 (2d Cir. 2001)).

An unreasonable application of established federal law occurs "if the state court arrives at

a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state

court decides a case differently than [the Supreme] Court has on a set of materially

indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13, 120 S.Ct. 1495, 1523, 164

L.Ed.2d (2000). Alternatively, "a federal habeas court may grant the writ if the state court

identifies the correct governing legal principle from [the Supreme] Court's decisions but

unreasonably applies that principle to the facts of [a] prisoner's case." Id. at 413.

The Supreme Court has stated that "[a]s amended by AEDPA, § 2254(d) stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings." Harrington v. Richter, --- U.S. ----, 131 S.Ct. 770, 786, 178 L.Ed.2d 624 (2011) ("If this standard is difficult to meet, that is because it was meant to be."). "Section 2254(d) reflects the view that habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." Id. (quoting Jackson v. Virginia, 443 U.S. 307, 332, n. 5, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (Stevens, J., concurring)). A state court's unreasonable application of law must have been more than "incorrect or erroneous"; it must have been "objectively unreasonable." Sellan, 261 F.3d at 315 (quotations and citation omitted); see also Sorto v. Herbert, 497 F.3d 163, 169 (2d Cir. 2007).

Claims that were not adjudicated on the merits in state court are not subject to the deferential standard that applies under AEDPA. See Cone v. Bell, 556 U.S. 449, 472, 129 S.Ct. 1769, 1784, 173 L.Ed.2d 701 (2009) (citing 28 U.S.C. § 2254(d)). Where AEDPA's deferential standard of review does apply, "[a] state court's determination of a factual issue is presumed to be correct, and may only be rebutted by clear and convincing evidence." Bierenbaum v. Graham, 607 F.3d 36, 48 (2d Cir. 2010) (citing 28 U.S.C. § 2254(e)(1)). Federal habeas review is limited to determining whether a petitioner's custody violates federal law, see 28 U.S.C. § 2254(a), and "does not lie for errors of state law." Swarthout v. Cooke, --- U.S. ----, 131 S.Ct. 859, 861, 178 L.Ed.2d 732 (2011) (citations omitted).

III.    Discussion

A.    Petitioner's Arguments

Petitioner raises the following issues in his petition for a writ of habeas corpus: (1) he was denied his Sixth Amendment right to confront a witness against him when the trial court admitted testimony concerning Bambara's statements; (2) witnesses for the prosecution gave improper opinion testimony; (3) the evidence was insufficient to prove guilt beyond a reasonable doubt and the verdict was against the weight of the evidence; (4) comments made by the prosecutor during voir dire denied him the right to an impartial jury; (5) the sentence imposed was harsh and excessive; and (6) he was denied effective assistance of counsel. Petition ("Pet.") [Docket Entry No. 1] at 2-4.

B.    Sixth Amendment Right to Confrontation

First, petitioner argues that he was denied his Sixth Amendment right to confrontation when the trial court allowed the testimony of Bambara's statements implicating petitioner in the fire. See Pet. at 7; Petitioner's Reply [Docket Entry No. 42] at 31-36. Petitioner relies primarily on the Supreme Court's ruling in Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), which held that "testimonial" hearsay statements are inadmissible unless the declarant is unavailable and the defendant had a prior opportunity for cross-examination.

1.    State Court Proceedings

Prior to trial, the defense moved for an order precluding the introduction of Officer Chapoteau's testimony with respect to Bambara's statements on the ground that such testimony

would consist of inadmissible testimonial hearsay. In a written decision, Judge Weber held "that there is sufficient evidence that the statements were 'made under the stress of excitement caused by an external event, and not the product of studied reflection'" admissible pursuant to the "excited utterance" exception to the hearsay rule. Decision dated August 31, 2004 at 2 (citing People v. Johnson, 1 N.Y.3d 302, 804 N.E.2d 402 (2003)). Judge Weber also concluded that the statements made to Officer Chapoteau were testimonial under Crawford:

> [I]t is evident that the officer's questions were *not* for the purpose of rendering aid to the victim. The victim was already receiving aid and it was self evident that he had been burned in the fire as first reported in the 911 call and confirmed by observations apparent to everyone on the scene. The officer's questions were clearly and unequivocally directed to ascertaining the agency by which this fire had started . . . . It is equally certain that the victim knew and understood the importance of the statements he gave in response to the inquiry made by the uniformed officer. Under any standard, the victim was giving a statement he knew could be used to apprehend and prosecute the defendant in this case. The victim's statement that "Brendan burned me and now he is going to jail." removes all doubt concerning the declarant's purpose of the statements he was making to the investigating officer.

Id. at 5. Nevertheless, the trial court permitted the testimony because it found evidence that defendant caused the death of the declarant, and therefore waived his right to confront the declarant and cross examine him. See id. at 6-7 (citing Crawford, 541 U.S. at 62, 124 S.Ct 1354).

During trial, defense counsel objected to similar testimony by Mazza, Heinlein, Szabo, and Doctor Johnson, but each objection was overruled. T224-25, T260, T294, T468.

On appeal, the Appellate Division found that the testimony was properly admitted into evidence, but held that Bambara's statements were *not* testimonial:

> [T]he County Court properly admitted into evidence statements made by the decedent after the fire in question under the excited utterance exception to the

hearsay rule. Further, the admission of these statements did not violate the defendant's right to confrontation because they were *not testimonial* in nature.

People v. Donohue, 50 A.D.3d at 821 (emphasis added).


2.    Whether the Statements Were "Testimonial" in Nature

The Sixth Amendment to the United States Constitution provides, in pertinent part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. In Crawford, the Supreme Court held that the Confrontation Clause bars the admission of "testimonial" statements unless the declarant is unavailable to testify and the defendant had a prior opportunity to cross examine the declarant. 541 U.S. at 68, 124 S.Ct 1354. "Crawford's per se bar applies 'regardless of whether [the testimonial] statement falls within a firmly rooted hearsay exception or has particularized guarantees of trustworthiness.'" United States v. Feliz, 467 F.3d 227, 231 (2d Cir. 2006) (quoting United States v. Saget, 377 F.3d 223, 226 (2d Cir. 2004)). Conversely, "the Confrontation Clause simply has no application to nontestimonial statements." Id.; see also Davis v. Washington, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006).

Crawford noted that "the principal evil at which the Confrontation Clause was directed was the civil-law mode of criminal procedure, and particularly its use of *ex parte* examinations as evidence against the accused." Crawford, 541 U.S. at 50, 124 S.Ct. 1354. "Consistent with that approach, the Court suggested that an 'off-hand, overheard remark' would not be testimonial under the Sixth Amendment because 'it bears little resemblance to the civil law abuses the Confrontation Clause targeted.'" Feliz, 467 F.3d at 232 (quoting Crawford, 541 U.S. at 51, 124 S.Ct. 1354). On the other hand, "a statement produced through the '[i]nvolvement of

12

government officers' and with an 'eye towards trial' is testimonial because it 'presents [a] unique potential for prosecutorial abuse . . . .'" Id. (quoting Crawford, 541 U.S. at 56 n. 7, 124 S.Ct. 1354).

> Various formulations of this core class of testimonial statements exist: *ex parte* in-court testimony or its functional equivalent-that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially . . .; extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions . . . statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial . . . . These formulations all share a common nucleus and then define the Clause's coverage at various levels of abstraction around it.

Crawford, 541 U.S. at 51-52, 124 S.Ct. 1354 (internal quotation marks and citations omitted). "Whatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations. These are the modern practices with closest kinship to the abuses at which the Confrontation Clause was directed." Id. at 68. However, "it is unwise to read Crawford's catalog of the 'core class of testimonial statements' as more than a set of guideposts as courts work through, case-by-case, different kinds of statements and determine whether they are testimonial. This part of Crawford cannot be a holding, as no court can say whether a particular kind of statement is testimonial until it has considered that kind of statement in an actual case." United States v. Burden, 600 F.3d 204, 224 (2d Cir. 2010).

In Davis v. Washington, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), which was decided after petitioner's trial but before his appeal, the Court clarified under what circumstances statements made during a police interrogation qualify as "testimonial":

13

> Statements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

547 U.S. at 822, 126 S.Ct. 2266.

Applying this standard, Davis held that statements made by a domestic violence victim to a 911 emergency operator were not testimonial because "the circumstances of [the] interrogation objectively indicate its primary purpose was to enable police assistance to meet an ongoing emergency." Id. at 828. In reaching this conclusion, the Court emphasized several facts. First, the victim "was speaking about events *as they were actually happening*, rather than describing past events." Id. at 827 (emphasis in original) (internal quotation marks and citation omitted). Second, since the victim's assailant was still in her house when the call began, "any reasonable listener would recognize that [she] was facing an ongoing emergency." Id. Third, "the elicited statements were necessary to be able to *resolve* the present emergency." Id. (emphasis in original). Identification of the assailant was needed "so that the dispatched officers might know whether they would be encountering a violent felon." Id. Fourth, the victim's answers were frantically given, in an environment that was neither calm nor safe, unlike the formal interrogation in Crawford, which took place at a police station. Id.

In contrast, in Davis' companion case, Hammon v. Indiana, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), the Court found that there was no emergency and therefore statements made to police were "testimonial." In that case, police responded to a domestic disturbance report and found the victim-witness alone on her porch. Id. at 819. The victim told

them "nothing was the matter," although the defendant-assailant was still present at the scene. Id. The defendant told the police that there had previously been an argument, but "everything was fine now." Id. The police took the victim into another room and questioned her about "what had occurred." Id. The victim's account of the assault was recorded and introduced at trial, despite her refusal to testify. Id. at 820. The Supreme Court reversed, holding that the statements were testimonial because there was "no emergency in progress." Id. at 829-830. "Objectively viewed, the primary, if not indeed the sole, purpose of the interrogation was to investigate a possible crime . . . ." Id. at 830.

Bambara's statements to Firefighter Heinlein, Firefighter Mazza, EMT Szabo, and Doctor Johnson were not "knowing responses to structured questioning in an investigative environment or a courtroom setting where the declarant would reasonably expect that his or her responses might be used in future judicial proceedings." Saget, 377 F.3d at 228; see also Davis, 547 U.S. 813, 126 S.Ct. 2266. The questioning was not part of a criminal investigation, but was motivated by the emergency workers' duty to treat Bambara's injuries and take control of a dangerous situation. An emergency was ongoing and Bambara was in critical condition. The aid of firefighters, emergency service workers, and hospital personnel was necessary to save him. See generally Moses v. Payne, 555 F.3d 742, 755 (9th Cir. 2009) (state court's finding that statements made to doctor were non-testimonial "not an unreasonable application of the legal principle established by Crawford"); Wright v. Secretary, Dept. of Corr., No. 10-cv-770, 2011 WL 2731079, at *5 (M.D. Fla. July 13, 2011) ("[A]ny questioning by the paramedics was for the purposes of providing the victim medical aid, not for the purpose of investigating a crime."); see also Davis, 547 U.S. 813, 126 S.Ct. 2266.

The statements made to Officer Chapoteau present a closer question. Nonetheless, under the AEDPA's deferential standard, this Court does not find that the Appellate Division unreasonably applied the Supreme Court law in place at the time of its decision.

As the Appellate Division adjudicated petitioner's confrontation claim on the merits, its determination that Bambara's statements to Officer Chapoteau were nontestimonial is entitled to AEDPA's deferential standard of review. See 28 U.S.C. § 2254(d). To warrant relief, the Appellate Division's application of the holdings of Crawford and Davis to the facts of this case must have been "objectively unreasonable." See Sellan, 261 F.3d at 315 (state court's "unreasonable application" of law must have been more than "incorrect or erroneous"; it must have been "objectively unreasonable"); Williams, 529 U.S. at 412 ("[§ 2254(d)] refers to the holdings, as opposed to dicta, of [the Supreme] Court's decisions at the time of the relevant state-court decision."). "[I]t is well-established in [the Second] Circuit that the 'objectively unreasonable' standard of § 2254(d)(1) means that petitioner must identify some increment of incorrectness beyond error in order to obtain habeas relief." Sorto, 497 F.3d at 169. Petitioner has failed to meet his burden.

Both petitioner and respondent use Davis to support their arguments as to whether these statements were testimonial. Petitioner argues that there was no "ongoing emergency," and that Chapoteau's question ("What happened?") was "clearly an investigatory question," because the source of Bambara's injuries was apparent. Petitioner's Memorandum [Docket Entry No. 16] ("Pet. Mem.") at 63. Respondent counters that Officer Chapoteau's question was a "natural, human question" under the circumstances, because Chapoteau was not fully aware of the nature and cause of the fire, and was trying to assemble as much information as possible in an apparent

emergency. Respondent's Memorandum in Opposition [Docket Entry No. 36] ("Resp. Mem.") at 24-25.

The facts support a determination that Officer Chapoteau's primary purpose was not "to nail down the truth about past criminal events," but to assist in rendering medical aid and "to assess the situation, the threat to [his] own safety, and possible danger to the potential victim." Davis, 547 U.S. at 830-831, 126 S.Ct. 2266. Chapoteau arrived at the scene at about the same time as firefighters and paramedics, just a few minutes after the 911 call. He saw a car engulfed in flames and knew a person had been inside, but did not know the cause of the fire, or the location of any potential perpetrators. Chapoteau saw that Bambara was badly burned and in critical condition. His questions ("What is your name?" "What happened?") were basic, asked at the very preliminary stage in responding to an apparent emergency. This warrants a conclusion that his primary purpose was to provide aid, not investigate a crime. See Nieves-Andino v. Conway, 08 CIV. 5887, 2010 WL 1685970, at *17 (S.D.N.Y. April 20, 2010) ("[The interrogating officer] needed to ascertain the cause of [shooting victim's] injuries to determine whether he could assist him medically and what, if any, action was necessary to prevent further harm . . . . [The] assailant's name, address, and the statement that he had an argument with the victim . . . would enable the officers to assess the present situation and determine whether there was an ongoing threat – for example, the seriousness of the shooter's intent to kill . . . such that he might return to see the job through to completion.")

Furthermore, Officer Chapoteau asked what happened *before* it became clear that the fire was intentionally set. Thus, it cannot be said that his purpose was to "establish or prove past events [for use in a criminal prosecution]." See Davis, 547 U.S. at 822, 126 S.Ct. 2266.

17

Chapoteau's subsequent interaction with Bambara further supports this conclusion: his only follow-up question was whether there had been anyone else in the car, so he could determine whether he should be searching for another victim. T191-192. He did not ask for additional information about the petitioner, or for any other information that would be useful in a criminal investigation.

The Supreme Court's decision in <u>Michigan v. Bryant</u>, --- U.S. ----, 131 S.Ct. 1143, 179 L.Ed.2d 93 (2011) also supports the conclusion that the Appellate Division reasonably applied <u>Crawford</u> and <u>Davis</u>. In <u>Bryant</u>, police found a man mortally wounded in a gas station parking lot. <u>Id.</u> at 1150. The man told them that he had been shot, and identified the shooter as well as the location of the shooting. Their conversation "ended within 5 to 10 minutes when emergency medical services arrived." <u>Id.</u> The Supreme Court held that these statements were nontestimonial because they had a primary purpose to enable police assistance to meet an ongoing emergency. <u>Id.</u> at 1165-66 ("[P]olice responded to a call that a man had been shot . . . . [T]hey did not know why, where, or when the shooting had occurred. Nor did they know the location of the shooter or anything else about the circumstances in which the crime occurred . . . . [Their questions—] 'what had happened, who had shot him, and where the shooting occurred,—were the exact type [needed] to assess the situation, the threat to their own safety, and possible danger to the potential victim and to the public . . . .") (internal quotation marks and citation omitted)). Similarly, Officer Chapoteau's questions were necessary to properly assess the situation, secure the location, and account for public safety.

The inquiry does not focus solely on Officer Chapoteau's purpose, however. "<u>Davis</u> requires a combined inquiry that accounts for both the declarant and the interrogator." <u>Id.</u> at

1160-1161 ("In addition to the circumstances in which an encounter occurs, the statements and actions of both the declarant and interrogators provide objective evidence of the primary purpose of the interrogation."). "At trial, the declarant's statements, not the interrogator's questions, will be introduced to 'establis[h] the truth of the matter asserted' . . . and must therefore pass the Sixth Amendment test." Id. at 1162 (quoting Crawford, 541 U.S. at 60 n. 9; 124 S.Ct. 1354).

Petitioner argues that the declarant's objective purpose was to provide testimony accusing petitioner of causing his injuries. He points to his statement, "Brendan burned me and now he is going to jail," as evidence of Bambara's testimonial state of mind. Pet. Mem. at 66. Further supporting petitioner's view is Officer Chapoteau's testimony that "[Bambara] was very concerned about getting out the story of what happened to him," T199, and that the first thing Bambara said was "Brendan burned me." T141.

However, "[v]ictims are [] likely to have mixed motives when they make statements to police. During an ongoing emergency, a victim is most likely to want the threat to her and to other potential victims to end, but that does not necessarily mean that the victim wants or envisions prosecution of the assailant. A victim may want the attacker to be incapacitated temporarily or rehabilitated." Bryant, 131 S.Ct. at 1161. Likewise, "[t]he medical condition of the victim is important to the primary purpose inquiry to the extent that it sheds light on the ability of the victim to have any purpose at all in responding to police questions and on the likelihood that any purpose formed would necessarily be a testimonial one." Id. at 1159. Bambara had just been badly burned; he was evidently very upset, very agitated, and in great pain. T88. Considering his condition, it would not be objectively unreasonable to conclude that Bambara formed no testimonial purpose. See Bryant, 131 S.Ct. at 1161; 179 L.Ed.2d 93 ("a

19

severely injured victim may have no purpose at all in answering questions posed; the answers may be simply reflexive. The victim's injuries could be so debilitating as to prevent her from thinking sufficiently clearly to understand whether her statements are for the purpose of addressing an ongoing emergency or for the purpose of future prosecution."). In sum, the Appellate Division's conclusion is not objectively unreasonable.

Even if the statements were improperly admitted, such error would be harmless in light of the overwhelming evidence of guilt in this case. On habeas review, constitutional error is harmless unless it has a "substantial and injurious effect" on the verdict. Fry v. Pliler, 551 U.S. 112, 121-22, 127 S.Ct. 2321, 168 L.Ed.2d 16 (2007) (citing Brecht v. Abrahamson, 507 U.S. 619, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993)). This standard is "'less onerous' than the . . . 'harmless beyond a reasonable doubt' standard applied on direct review." Wood v. Ercole, 644 F.3d 83, 93 (2d Cir. 2011) (citing Brecht, 507 U.S. at 635-37, 113 S.Ct. 1710).

In assessing "whether the erroneous admission of evidence had a substantial and injurious effect on the jury's decision" the Court must consider (1) "the importance of the . . . wrongly admitted [evidence]," and (2) "the overall strength of the prosecution's case." Wood, 644 F.3d 83 at 94. In turn, the importance of the wrongly admitted evidence is judged by (1) "the prosecutor's conduct with respect to the [evidence]"; (2) "whether the evidence bore on an issue . . . plainly critical to the jury's decision"; and (3) "whether [it] was material to the establishment of the critical fact, or whether it was instead corroborated and cumulative." Id. (citations omitted).

The importance of Bambara's statements to Officer Chapoteau is slight when viewed in context with the rest of the People's case. Indeed, Officer Chapoteau's testimony on this issue

was consistent with the testimony of Mazza, Heinlein, Szabo, and Johnson. Furthermore, Erden's testimony and the surveillance videotape demonstrated that: petitioner had pumped gasoline into a can a short time before Erden heard the flame ignite, T384, a similar can was later found near the scene with traces of gasoline in it, T912-16, Erden witnessed petitioner walking away from the fire, and petitioner had injuries consistent with having stood near the fire when it ignited. T394-86, 1008. Considering the overwhelming evidence consistent with petitioner's guilt, it cannot be said that admission of Bambara's hearsay statements had a "substantial and injurious effect" on the verdict.

To the extent petitioner argues that the state courts improperly applied New York's "excited utterance" exception to its hearsay rule, "[e]rroneous evidentiary rulings do not . . . rise to the level of constitutional error sufficient to warrant issuance of a writ of habeas corpus [except] where petitioner can show that the error deprived [him] of a *fundamentally fair* trial." Taylor v. Curry, 708 F.2d 886, 891 (2d Cir. 1983) (citing cases) (emphasis in original). Petitioner has failed to make such a showing, and it is generally not the province of a federal habeas court to reexamine "a New York state-court determination of New York state evidentiary law." Phillips v. Lee, No. 10-CV-4685, 2012 WL 847432, at *9 n. 6 (E.D.N.Y. Mar. 13, 2012) (citing Estelle v. McGuire, 502 U.S. 62, 67-68, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991)).


C.      Expert Testimony

Petitioner argues that he was denied his right to a fair trial because the trial court erroneously admitted certain expert testimony. First, petitioner contends that Detective Fitzgerald and Doctor Dawson rendered improper opinion testimony regarding the ultimate issue

of petitioner's guilt. See Pet. Mem. at 78-80. Second, he claims that Detective Fitzgerald improperly "testified about [and bolstered Bambara's hearsay] statements to support his opinion that Mr. Bambara did not . . . start the fire." Id. at 84. Third, he argues that Doctor Hagerty's assessment of Bambara's medical records should have been excluded because the doctors who personally evaluated Bambara did not testify. Id. at 88. Fourth, he argues that Doctor Hagerty's opinion that Bambara did not set the fire exceeded the scope of her psychiatric expertise and thus was not admissible. Id. at 89-92. These claims, however, are procedurally barred from federal habeas review.

"An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A); see also Carvajal v. Artus, 633 F.3d 95, 104 (2d Cir. 2011) ("[B]efore a federal court can consider a habeas application brought by a state prisoner, the habeas applicant must exhaust all of his state remedies."). "Exhaustion of state remedies requires that a petitioner fairly present federal claims to the state courts in order to give the state the opportunity to pass upon and correct alleged violations of its prisoners' federal rights." Cornell v. Kirkpatrick, 665 F.3d 369, 375 (2d Cir. 2011) (quoting Carvajal, 633 F.3d at 104). In order to exhaust his state remedies, petitioner must "'fairly present' the federal claim 'in each appropriate state court (including a state supreme court with powers of discretionary review).'" Richardson v. Superintendent of Mid-Orange Corr. Facility, 621 F.3d 196, 201 (2d Cir. 2010) (quoting Baldwin v. Reese, 541 U.S. 27, 29, 124 S.Ct. 1347, 158 L.Ed.2d 64 (2004)). This means that the "petitioner must 'present[] his [or her] claim

to the highest court of the state.'" Galdamez v. Keane, 394 F.3d 68, 73 (2d Cir. 2005) (quoting Morgan v. Bennett, 204 F.3d 360, 369 (2d Cir. 2000)).

"[W]hen a 'petitioner failed to exhaust state remedies and the court to which the petitioner would be required to present his claims in order to meet the exhaustion requirement would now find the claims procedurally barred,' the federal habeas court should consider the claim to be procedurally defaulted." Clark v. Perez, 510 F.3d 382, 390 (2d Cir. 2008) (quoting Coleman v. Thompson, 501 U.S. 722, 735 n.1, 111 S. Ct. 2546, 115 L. Ed. 2d 640 (1991).

"[A]bsent showings of 'cause' and 'prejudice,' federal habeas relief will be unavailable when (1) a state court [has] declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement, and (2) the state judgment rests on independent and adequate state procedural grounds." Walker v. Martin, ---U.S. ----, 131 S.Ct. 1120, 1127, 179 L.Ed.2d 62 (2011) (internal quotation marks and citations omitted); see also Carvajal v. Artus, 633 F.3d 95, 104-05 (2d Cir. 2011). In order for a claim to be procedurally defaulted such that federal habeas review is precluded, the state court's reliance on state law must be "clear from the face of the opinion." Fama v. Comm'r of Corr. Svcs., 235 F.3d 804, 809 (2d Cir. 2000) (internal quotations and citation omitted); see also Messiah v. Duncan, 435 F.3d 186, 195 (2d Cir. 2006). If a state court holding contains a plain statement that a claim is procedurally defaulted, then the federal court may not review it, even if the state court also rejected the claim on the merits. See Harris v. Reed, 489 U.S. 255, 264 n. 10, 109 S.Ct. 1038, 103 L.Ed.2d 308 (1989) ("a state court need not fear reaching the merits of a federal claim in an *alternative* holding" so long as it explicitly invokes a state procedural rule as a separate basis for its decision); see also Murden v. Artuz, 497 F.3d 178, 191 (2d Cir. 2007).

Petitioner's claims regarding Dr. Hagerty's testimony were not raised in his direct appeal. Accordingly, this claim is procedurally defaulted, and he may not now seek review of it in state court. See Dotwin v. Cohen, 179 Fed. Appx. 737, 739 (2d Cir. 2006).

The Appellate Division clearly rejected as unpreserved for appellate review the "defendant's contentions regarding the testimony of the People's expert witnesses [Detective Fitzgerald and Dr. Dawson]." Donohue, 50 A.D.3d at 820. Since the Appellate Division invoked an independent and adequate state procedural rule as a basis for its rejection of petitioner's claims, those claims are also procedurally defaulted.

Petitioner has not established cause for the defaults, actual prejudice, or that it would be a fundamental miscarriage of justice if the claims were not reviewed. As a result, those claims are barred from federal habeas review. Petitioner's contention that his trial counsel in fact preserved some of the testimony at issue is without support in the record.


D.     Sufficiency of Evidence

Petitioner's sufficiency of the evidence claim is clearly without merit. When considering the legal sufficiency of the evidence of a state conviction, the court "must look to state law to determine the elements of the crime," Ponnapula v. Spitzer, 297 F.3d 172, 179 (2d.Cir.2002) (citation omitted); see also Langston v. Smith, 630 F.3d 310, 314 (2d Cir.2011), and determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979) (emphasis in original); see also Cavazos v. Smith, ---- U.S. ----, 132 S. Ct. 2, 181 L. Ed. 2d 311 (2011). "[A]

24

reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" Cavazos, 132 S.Ct. at 6, 181 L.Ed.2d 311 (quoting Jackson, 443 U.S. at 326, 99 S.Ct. 2781). Moreover, when challenging the legal sufficiency of the evidence in a state criminal conviction, the petitioner "bears a very heavy burden," Ponnapula, 297 F.3d at 179, of "rebutting the presumption that all factual determinations made by the state court were correct." Farrington v. Senkowski, 214 F.3d 237, 241 (2d Cir.2000) (citing 28 U.S.C. § 2254(e)).

There is more than sufficient evidence in the record from which a rational juror could have found petitioner guilty of arson in the first degree and murder in the second degree. The evidence against petitioner at trial included, inter alia, the testimony of Ozgur Erden, who watched petitioner pump gasoline into a can just before he heard the flame ignite, after which he saw petitioner walking away from the burning car; a surveillance video corroborating Erden's testimony; testimony relating the victim's identification of the petitioner as the person who set the fire; and expert testimony ruling out accidental causes of the fire and demonstrating that petitioner's injuries were consistent with him standing near the fire when it ignited. Petitioner's claim that the victim may have ignited the fire himself was presented to and rejected by the jury. Viewing the evidence in the light most favorable to the prosecution, as it must, the Court finds that a rational trier of fact could have found petitioner guilty of first degree arson and second degree murder beyond a reasonable doubt.

To the extent petitioner intends to argue that the verdict was against the weight of the evidence, the Court will not consider the claim because "[a] 'weight of the evidence' argument is

25

a pure state law claim grounded in New York Criminal Procedure Law § 470.15(5) . . . ." <u>Correa v. Duncan</u>, 172 F.Supp.2d 378, 381 (E.D.N.Y. 2001); <u>see also</u> <u>Andrews v. LeClaire</u>, 709 F.Supp.2d 269, 278-79 (S.D.N.Y. 2010) ("[E]rrors by the court on issues of state law are not reviewable by federal courts in a habeas petition.").

      E.      Prosecutor's Comments During Voir Dire

Petitioner contends that the prosecutor improperly used, during voir dire, a hypothetical scenario "strikingly similar" to the facts of his case to determine whether prospective juror number fourteen (14) believed that someone in an excited state was likely to be truthful. Pet. Mem. at 105. He argues the question was "designed to influence . . . the prospective jurors . . . awaiting questioning," and that the juror's subsequent response endorsed the accuracy of Bambara's hearsay statements, thus "compromis[ing] the jury's ability to be impartial." Pet. Mem. at 106. This claim is without merit.

"It appears that neither the courts in this Circuit nor the Supreme Court have specifically discussed the constitutional contours of . . . . a claim [that a prosecutor erroneously asked jurors hypothetical questions presenting allegedly similar facts to those needed to be proven at trial.]" <u>York v. Fischer</u>, 04-CV-1467, 2006 WL 6461993, at *8 (E.D.N.Y. July 21, 2006). The Supreme Court has noted that "[t]he Constitution ... does not dictate a catechism for voir dire, but only that the defendant be afforded an impartial jury." <u>Morgan v. Illinois</u>, 504 U.S. 719, 729, 112 S. Ct. 2222, 2230, 119 L. Ed. 2d 492 (1992). The Eighth Circuit has recognized: "[A]lthough there are no constitutional provisions directly addressing the use of hypothetical questions during voir dire, there may be circumstances where a party's manner of conducting voir dire renders a jury []

partial and thereby triggers a Sixth Amendment violation." <u>Hobbs v. Lockhart</u>, 791 F.2d 125, 129 (8th Cir. 1986).

Here, the prosecutor's inquiry did not include facts of petitioner's case or attempt to commit the prospective jurors to a specific view of the facts, nor did it suggest the accuracy of Bambara's hearsay statements. Rather, it appears that the prosecutor was only attempting to inquire whether a prospective juror could evaluate evidence admitted under the "excited utterance" exception to the hearsay rule. The juror did not commit to specific findings, but merely stated his belief that "generally, the chances are better that you are going to get more accurate information, the sooner, that you make the inquiries." T110. Moreover, there is "no indication that the jurors did not fairly evaluate the evidence when it was presented to them at trial or that jurors made credibility determinations based on the voir dire questions rather than the trial testimony and evidence." <u>York</u>, 2006 WL 6461993, at *10 (holding that questions utilizing facts similar to those of the case to ensure that jurors would understand the elements of the crime and to gauge jurors' ability to evaluate eyewitness testimony did not compromise the jury's impartiality).

Thus, the Appellate Division's denial of petitioner's prosecutorial misconduct claim was not contrary to or an unreasonable application of federal law, and petitioner was not deprived of a trial by an impartial jury.

F.    Excessive Punishment

To evaluate claims of an excessive sentence, the Supreme Court has articulated a principle of "gross proportionality," which finds unconstitutional under the Eighth Amendment

only extreme sentences that are grossly disproportionate to the crimes for which they are imposed. See Harmelin v. Michigan, 501 U.S. 957, 111 S.Ct. 2680, 115 L.Ed.2d 836 (1991); Solem v. Helm, 463 U.S. 277, 103 S.Ct. 3001, 77 L.Ed.2d 637 (1983); Rummel v. Estelle, 445 U.S. 263, 100 S.Ct. 1133, 63 L.Ed.2d 382 (1980). Federal courts reviewing sentences imposed by state courts on habeas corpus review "should grant substantial deference to the broad authority that legislatures necessarily possess in determining the types and limits of punishments for crimes, as well as to the discretion that trial courts possess in sentencing convicted criminals." Solem, 463 U.S. at 290, 103 S.Ct. 3001. The "gross disproportionality" principle finds sentences disproportionate to their crimes "only in the exceedingly rare and extreme case." Lockyer v. Andrade, 538 U.S. 63, 73–77, 123 S.Ct. 1166, 155 L.Ed.2d 144, S.Ct. 1166 (2003) (internal quotation marks and citation omitted); see also United States v. Snype, 441 F.3d 119, 152 (2d Cir.2006). In the Second Circuit, "[n]o federal constitutional issue is presented where . . . the sentence is within the range prescribed by state law." White v. Keane, 969 F.2d 1381, 1383 (2d Cir.1992); see also United States v. Gonzalez, 922 F.2d 1044, 1053 (2d Cir.1991) (courts should review proportionality of sentences only in rare cases because the legislature's fixing of terms for imprisonment is presumptively valid).

At the time of sentencing, New York's guidelines for an A-I felony were a minimum indeterminate term of incarceration of fifteen (15) years to life with a maximum indeterminate term of incarceration of twenty-five (25) years to life. N.Y. Penal Law §§ 70.00(2)(a) and (3)(a)(i). Petitioner's sentence fell within this range and was appropriate for the gravity of the crime committed. Therefore, no federal constitutional issue is presented, and petitioner's claim is without merit.

G.     Ineffective Assistance of Counsel

Finally, petitioner asserts an ineffective assistance of counsel claim arising from: (1) trial counsel's failure to object to the admission of certain testimony by Detective Fitzgerald and Dr. Dawson, see supra; (2) trial counsel's failure to object to the trial court's response to the jury's request for a readback of Detective Ruddick's testimony; (3) appellate counsel's failure to raise the same issue; and (4) appellate counsel's failure to argue that the prosecution's summation deprived him of a fair trial.

The first claim was raised in petitioner's direct appeal and was rejected by the Appellate Division. People v. Donohue, 50 A.D.3d at 820 ("The defendant's remaining contentions are without merit.").[2] Petitioner raised the second, third, and fourth claims in his petition for a writ of error coram nobis, which the Appellate Division summarily denied. See People v. Donohue, 65 A.D.3d 698, 883 N.Y.S.2d 914.

1.     Standard for Ineffective Assistance of Counsel

In order to prevail on a Sixth Amendment ineffective assistance of counsel claim, a petitioner must prove both: (1) that counsel's representation "fell below an objective standard of reasonableness" measured against "prevailing professional norms;" and (2) that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 694, 104 S.Ct. 2052, 80

---

[2] "[W]here a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing that there was no reasonable basis for the state court to deny relief." Harrington v. Richter, --- U.S. ----, 131 S.Ct. 770, 784, 178 L.Ed.2d 624 (2011); see also Watson v. Green, 640 F.3d 501, 511 (2d Cir.2011).

L.Ed.2d 674 (1984); see also Padilla v. Kentucky, --- U.S. ----, 130 S.Ct. 1473, 176 L.Ed.2d 284 (2010). On habeas review of an ineffective assistance of counsel claim, "[t]he pivotal question is whether the state court's application of the Strickland standard was unreasonable." Harrington, 131 S.Ct. at 785; see also Byrd v. Evans, 420 Fed. Appx. 28 (2d Cir. 2011).

The AEDPA requires federal courts to give state courts "deference and latitude" when considering an ineffective assistance of counsel claim on habeas review. Harrington, 131 S.Ct. at 786. Thus, review of a state court's rejection of an ineffective assistance of counsel claim is "doubly deferential." Knowles v. Mirzayance, 556 U.S. 111, 129 S.Ct. 1411, 173 L.Ed.2d 251 (2009); see also Cullen v. Pinholster, --- U.S. ----, 131 S.Ct. 1388, 1403, 179 L.Ed.2d 557 (2011). Thus, in order to prevail on his ineffective assistance of counsel claim, petitioner must demonstrate that it was "necessarily unreasonable" for the state court to conclude "(1) that [petitioner] had not overcome the strong presumption of competence; and (2) that [petitioner] had failed to undermine confidence in the [jury's verdict and his sentence]." Cullen, 131 S.Ct. at 1403.

Although the Supreme Court formulated the two-pronged Strickland test in the context of an ineffective assistance of trial counsel claim, it has since extended application of that standard to ineffective assistance of appellate counsel claims. Smith v. Robbins, 528 U.S. 259, 285–86, 120 S.Ct. 746, 145 L.Ed.2d 756 (2000). A petitioner may demonstrate ineffective assistance of appellate counsel by showing that his or her appellate counsel "omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." Clark v. Stinson, 214 F.3d 315, 322 (2d Cir. 2000) (citing Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir.1994)). However, a petitioner may not rebut the presumption of effective assistance by simply arguing

that appellate counsel's decision to raise certain issues and not others constitutes ineffectiveness. See Strickland, 466 U.S. at 689, 104 S.Ct. 2052. Appellate counsel is not required to "press nonfrivolous points . . . if counsel, as a matter of professional judgment, decides not to present those points." Jones v Barnes, 463 U.S. 745, 751, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983); see also Knowles, 556 U.S. at 125, 129 S.Ct. 1411 ("The law does not require counsel to raise every available nonfrivolous defense").

> When a claim of ineffective assistance of counsel is based on failure to raise viable issues, the district court must examine the trial court record to determine whether appellate counsel failed to present significant and obvious issues on appeal. Significant issues which could have been raised should then be compared to those which were raised. Generally, only when ignored issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome.

Mayo, 13 F.3d at 533 (quoting Gray v. Greer, 800 F.2d 644, 646 (7th Cir.1985)).


2.     Whether Petitioner Was Denied Effective Assistance of Counsel

Petitioner has not established that he was denied effective assistance of counsel. The record indicates that petitioner's trial counsel presented a vigorous defense. Counsel moved in limine, albeit unsuccessfully, to suppress Bambara's hearsay statements, subpoenaed significant evidence, including Bambara's medical records, interposed appropriate objections, and effectively cross-examined witnesses. See United States v. DiPaolo, 804 F.2d 225, 234–35 (2d Cir.1986) (holding that defendants were not denied effective assistance of counsel where counsel appeared well prepared and had good understanding of facts and legal principles involved in case); Gonzalez v. United States, 337 F.Supp.2d 419, 423 (E.D.N.Y.2004) ("So long as the challenged attorney is prepared with relevant facts and appropriate legal standards, strategic

decisions regarding the challenging of evidence . . . cannot be second-guessed in an effort to support an ineffective assistance of counsel claim.").

The deficiencies alleged by petitioner do not place trial counsel's performance "below an objective standard of reasonableness." Where a petitioner's claim rests in part upon counsel's failure to object to the admission of evidence, "it is necessary to determine whether the evidence was so damaging that counsel's failure to object deprived petitioner of the 'reasonably effective assistance' to which he is entitled." Quartararo v. Fogg, 679 F.Supp. 212, 240 (E.D.N.Y. 1988) (quoting Strickland, 466 U.S. at 687, 104 S.Ct. at 2064). Defense counsel's strategic decisions generally do not constitute ineffective counsel, even if they "open the door" to damaging evidence. See Cuevas v. Henderson, 801 F.2d 586 (2d Cir.1986). The Second Circuit has repeatedly declined to deem counsel ineffective "notwithstanding a course of action (or inaction) that seems risky, unorthodox or downright ill-advised." Tippins v. Walker, 77 F.3d 682, 686 (2d Cir.1996) (collecting cases).

In petitioner's case, Doctor Dawson's brief assertion that Bambara's death was a homicide was insignificant in light of the overwhelming evidence of guilt adduced at trial. Moreover, Detective Ruddick's testimony merely recounted the course of his investigation. It does not follow that by ruling out Bambara as a cause of the fire, Detective Ruddick opined on petitioner's guilt. There would therefore have been no merit to an objection. Even if there would have been merit to such an objection, petitioner cannot show that he suffered any prejudice due to counsel's failure to make it.

Furthermore, "a court's decision to refuse to allow readbacks of testimony when requested by the jury during deliberations is within the court's broad discretion." United States

v. Criollo, 962 F.2d 241, 243 (2d Cir. 1992). Here, the trial court did not refuse the jury's request, but merely explained that granting it would cause a significant delay. Doing so was entirely was proper, and an objection therefore would have been without merit. See United States v. Damsky, 740 F.2d 134, 138 (2d Cir. 1984) ("[T]he trial court, in its discretion, may take into account factors such as … whether giving the readback will unduly delay the proceeding."). Thus, it cannot be said that trial counsel's failure to object fell below an objective standard of reasonableness.

In any event, petitioner has failed to demonstrate a reasonable probability that the outcome of the trial would have been different had counsel objected to the challenged evidence and trial court rulings. See Strickland 466 U.S. at 687–94. A "reasonable probability" is a probability "sufficient to undermine confidence in the outcome." Knowles, 129 S.Ct. at 1422, 173 L.Ed.2d 251 (quoting Strickland, 466 U.S. at 694); Rosario v. Ercole, 601 F.3d 118, 123 (2d Cir. 2010). In light of the overwhelming evidence of petitioner's guilt of the crimes for which he was convicted, petitioner has not established that any alleged deficiency in his trial counsel's performance "undermine[d] confidence in the outcome" of the trial.

Likewise, petitioner's appellate counsel satisfied an objective standard of reasonableness. Appellate counsel raised six (6) issues and grounded in case law, and argued intelligibly for each of the claims. All of these claims were significantly stronger than the jury readback claim, which was unpreserved and meritless, or the prosecutorial misconduct claim.[3] Thus, appellate counsel's

---

[3] The prosecutorial misconduct claim is based upon petitioner's allegation that the prosecutor, during his summation, (1) reflected on petitioner's failure to testify, Pet. Mem. at 119-121; (2) expressed personal beliefs and directed arguments toward the jury's fear of crime, id. at 125; (3) vouched for the truth of his own witnesses, id. at 126; (4) improperly characterized the defense's arson expert, id. at 129; and (5) attacked defense counsel rather than the evidence, id. at 131. These claims have little merit or support in the record. Further, a review of the record indicates that there is overwhelming evidence to support petitioner's conviction absent any of the challenged comments by the prosecutor during summation. See Hudgins v. New York, No. 07 Civ 01862, 2009 WL 1703266, at *10-11

decision to forego those claims does not render his assistance ineffective. See Jones, 463 U.S. at 751, 103 S.Ct. 3308; see also Knowles, 556 U.S. 111, 129 S.Ct. at 1422. "For judges to second-guess reasonable professional judgments and impose on appointed counsel a duty to raise every 'colorable' claim suggested by a client would disserve the goal of vigorous and effective advocacy . . . ." Jones, 463 U.S. at 754, 103 S.Ct. 3308; see also Sellan. 261 F.3d at 317 (internal quotation marks omitted) (holding that the "process of winnowing out weaker arguments on appeal and focusing on those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy.")

Since petitioner has not demonstrated that the Appellate Division's denial of his ineffective assistance of counsel claim was contrary to, or an unreasonable application of, clearly established federal law, or was based on an unreasonable determination of the facts in light of the evidence presented at trial, 28 U.S.C. § 2254(d), habeas relief is not warranted on his ineffective assistance of counsel claim.

IV.    Conclusion

For the foregoing reasons, Donohue's petition for a writ of habeas corpus is denied in its entirety. As petitioner has failed to make a substantial showing of a violation of a constitutional right, a certificate of appealability will not issue. 28 U.S.C. § 2253(c)(1). In accordance with

---

(E.D.N.Y. June 18, 2009); see also Darden v. Wainwright, 477 U.S. 168, 181-182, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986) (finding that no deprivation of a fair trial resulted from alleged prosecutorial misconduct where "[t]he prosecutors' argument did not manipulate or misstate the evidence . . . implicate other specific rights of the accused . . ." and "[t]he weight of the evidence against petitioner was heavy . . . to support a finding of guilt on all charges . . . reduc[ing] the likelihood that the jury's decision was influenced by [the closing] argument").

Federal Rule of Civil Procedure 77, the Clerk of Court shall serve a copy of this order upon all parties, including petitioner at his last known address.

The Clerk of Court is directed to close this case.

**SO ORDERED.**

s/ Sandra J. Feuerstein

Sandra J. Feuerstein
United States District Judge

Dated:      July 13, 2012
              Central Islip, New York